PATTERSON, Judge.
The appellant, Michael Richard Fondren, appeals his conviction for first degree rape *1349 and sentence of life imprisonment without parole. After Fondren was sentenced and had filed his notice of appeal, the trial court appointed counsel to serve as his appellate counsel (hereinafter referred to as “initial appellate counsel”). Initial appellate counsel filed a motion for a new trial and subsequently filed an amended motion for new trial. The amended motion was denied without a hearing on December 28, 1993. The case action summary shows that on January 14, 1994, a hearing was held on the motion for a new trial[1] and the amended motion and that both motions were denied (the amended motion being denied twice). Thereafter, the trial court granted initial appellate counsel’s motion to withdraw, and present appellate counsel was appointed.
Fondren contends that his initial appellate counsel was ineffective for failing to raise the issue of ineffectiveness of trial counsel. He asserts that initial appellate counsel was ineffective on the following grounds:
(1) Fondren first asserts that, although counsel did in fact assert ineffectiveness of trial counsel in a motion for a new trial, as amended, he failed to follow the procedures set forth in Ex parte Jackson, 598 So.2d 895 (Ala.1992), and that such failure procedurally baiTed Fondren from pursuing the ineffective claim alleged in the motions.
(2) Fondren further asserts that initial appellate counsel was ineffective because more egregious examples of ineffectiveness of trial counsel would have been discovered had counsel filed a Jackson motion and received the trial record. (See infra for grounds that allegedly should have been asserted.)
(3) Fondren further contends that those grounds that were asserted in the motion for a new trial were not preserved for appellate review because the record is devoid of any supporting evidence. He asserts that because allegedly there was no evidentiary hearing or any affidavits accompanying the motions, there is nothing for this court to review in regard to the propriety of the denial of the motions. For example, Fon-dren points out that the ground of trial counsel’s failure to call witnesses was waived because initial appellate counsel failed to identify witnesses who were alleged to have been ready to testify to certain facts and because counsel failed to include with his motions affidavits of these alleged witnesses.
In arguing that he has satisfied the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Fondren states that “it is clear [he] was denied his right to present various legal issues, specifically issues regarding the ineffectiveness of his trial counsel on direct appeal.” He contends that had initial appellate counsel preserved the issues presented in the motions and followed Jackson to preserve other alleged errors of trial counsel, there is a reasonable probability that his conviction, or at least his sentence, would be reversed.
Fondren also contends that his trial counsel’s errors, taken together, amounted to ineffective assistance of counsel, which prejudiced him to the point that a reversal of his conviction would have been mandated but for the fact that the issue of ineffectiveness of trial counsel could not be considered on appeal. He asserts four areas of alleged ineffectiveness.
(1) Trial counsel failed to object to the consolidation for trial of the prosecutions of Fondren and the victim’s mother on the ground that their defenses were antagonistic to the point of being irreconcilable and mutually exclusive. Fondren also contends that because of this consolidation, the mother’s statements to the police detailing Fondren’s actions were allowed into evidence although the mother did not testify. He argues that, consequently, the victim’s testimony was corroborated, and the impact of the impeaching evidence was greatly lessened. He also asserts that the trial court’s granting of the mother’s motion for a judgment of acquittal at the conclusion of the state’s case had a devastating negative impact on his case.
(2) Trial counsel failed to object to the introduction of the statements by the mother, a nontestifying codefendant, to police, pursuant to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
*1350 (3) Trial counsel failed to request instructions on the allegedly lesser included offenses of attempted rape and first degree sexual abuse.
(4) Trial counsel failed to object to the prosecution’s failure to introduce evidence of the prior felony convictions that were used to enhance his sentence and to prove that he was in fact the individual named in the judgments relating to those convictions and that he was represented by counsel.
The Alabama Supreme Court has ruled that claims of ineffective assistance of trial counsel may not be considered for the first time on direct appeal. Jackson, 598 So.2d at 897. Here, initial appellate counsel was not able to raise all arguable issues before the trial court, including the claims of ineffective trial counsel, because he had not procured a transcript pursuant to Jackson and reviewed it. Thus, present appellate counsel had available to present for review only those issues of ineffective trial counsel asserted in initial appellate counsel’s motion for a new trial. Obviously, no claim of the alleged ineffectiveness of Fondren’s initial appellate counsel was presented to the trial court.
We have available to us two possible courses of action. Our first course of action, if the instant issues of ineffective trial and initial appellate counsel were not properly presented to the trial court, is to hold that any remedy lies in a petition for post-conviction relief filed pursuant to A.R.Crim.P. 32. See, e.g., Whitley v. State, 628 So.2d 1030 (Ala.Cr.App.1993); Hale v. State, 611 So.2d 1202, 1205 (Ala.Cr.App.1992). Cf. Page v. State, 622 So.2d 441 (Ala.Cr.App.1993) (wherein the court held that because the appellant’s counsel failed to strictly follow the requirements of Ex parte Jackson, the issue of ineffective counsel asserted for the first time on appeal was procedurally barred). The second course of action was recognized by the Alabama Supreme Court in Thompson v. State, 525 So.2d 820, 831 (Ala.1985), cert. denied, 488 U.S. 834, 109 S.Ct. 94, 102 L.Ed.2d 70 (1988). There, the supreme court held that this court may remand a case for the trial court to hear an ineffective counsel claim, where that claim is first raised on appeal, “if it determines justice would require it.” Id. (emphasis in original). Accord McLeod v. State, 627 So.2d 1065 (Ala.1993). See, e.g., Miller v. State, 568 So.2d 1253 (Ala.Cr.App.1990); Harris v. State, 512 So.2d 129 (Ala.Cr.App.1987).
We find that the case before us falls into this latter category. Several of the issues now asserted by Fondren, in the factual context presented by the record, are troubling, and we believe that justice demands a remand to allow Fondren to litigate the issue of ineffective counsel of both his trial counsel and his initial appellate counsel. For example, if proven, the claim that trial counsel should have objected to the testimony of the mother’s statement as being violative of Bru-ton could possibly make a ease of ineffective counsel under Strickland. In Bruton, the Supreme Court held that a defendant’s Sixth Amendment right to confrontation was violated by the admission into evidence of a nontestifying codefendant’s extrajudicial statement implicating the defendant. This Bruton issue is particular troubling when considered in the context of the implications on the credibility of the prosecution’s case, as the following facts indicate:
The first witness to testify was Detective Thomas H. Stewart, who testified to the statement made by the mother when she brought the victim to the Hoover Police Department to file a complaint on January 13, 1992. In that statement, the mother gave explicit, extensive details of the alleged rape of her daughter by Fondren, her live-in boyfriend. Detective Stewart testified that the mother told him the following: that Fondren had been having problems with the victim, so the mother took the victim to a motel for a few days; that the sexual assault occurred immediately after they returned from the motel to Fondren’s apartment; that Fondren was not sexually aroused by the victim, but felt that at her age (the victim was 11 years old) she needed to have a sexual encounter and to have her hymen broken; that Fon-dren told the victim’s mother to get the victim into the bedroom or he would kill the victim; that, once in the bedroom, he ordered the victim to disrobe and told her mother to spread vaseline on the victim’s vaginal area; that when he could not achieve an erection, *1351 he ordered the mother to manually stimulate him; that when he achieved an erection, he made the mother and the victim drink from a bottle of tequila; that he then lost his erection, but mounted the victim, ordered the mother to insert his penis into the victim’s vagina, and warned that if she refused, he would make the victim orally stimulate him until his erection returned; that the mother then inserted Fondren’s penis into the victim’s vagina, but then pulled it out and tried to lure him away from the victim; and that the mother then had intercourse with Fon-dren because he wanted to ejaculate. The mother stated that at first Fondren wanted to have intercourse in the victim’s presence, but, according to the detective, she was not clear as to where the victim was during this activity.
Detective Stewart continued the mother’s version as relayed to him: the mother convinced Fondren that the three of them should leave the apartment and get something to eat. While they were out, they first stopped at a service station where Fondren went in alone and then they went to Fon-dren’s brother’s house, where Fondren went into the residence alone. He returned to his car and showed the mother a handgun. They then went back to Fondren’s apartment, where the mother and the victim left Fondren under the pretext of going to get something to eat; instead they drove to Atlanta. The detective also testified that the mother told him that she was scared of Fon-dren; that Fondren had warned her that she had reason to be nervous; and that she felt that he was going to kill them. Finally, the detective testified that the mother gave no indication that Fondren had a weapon during the assault, that she had sought medical attention for her daughter, or that she had contacted the police before her telephone call from Georgia to the Hoover Police Department.
On cross-examination, the detective, reading from his report, testified that Fondren told the mother: “I want [the victim] because she is a virgin. It has to be a virgin. I don’t want to have sex. It doesn’t turn me on. I have to break the hymen.”
The state also presented the testimony of Hoover Police Department Investigator Tana N. Standiver of the contents of her interview with the victim at the police station. She testified that the victim had told her the following: Sometime after her mother had gone into the bedroom at Fondren’s beckoning, the victim went to the bedroom at her mother’s summons; there, Fondren, who was nude, locked the door and told the victim to go into the bathroom and take off her clothes; after complying, the victim was called back into the bedroom by Fondren; she lay down on the bed, as ordered by Fondren, and when she began crying, Fon-dren told her to shut up and asked if she wanted to see him kill her mother; Fondren then told her mother, who was clothed, to “hold him in his private part”; after the mother put vaseline on the victim’s vaginal area, as ordered by Fondren, he got on top of the victim and “hurt her real bad [i]n her took-took area” six or seven times; he then stood up and told her mother to manually stimulate him, which she did, and he then told her mother to put his penis into the victim; her mother held his genital area and “it hurt real bad”; then her mother pulled Fondren off of her, and the victim ran into the bathroom and stayed there until Fondren and her mother called her back into the bedroom; Fondren told her to drink some tequila and then lie on the bed where “he hurt her six or seven times”; her mother pulled Fondren off of the victim and the victim again ran into the bathroom where she threw up; she emerged from the bathroom when summoned by Fondren and she heard Fondren order her mother to remove her clothes; her mother and the victim then went into the bathroom where her mother removed her clothes; when they returned to the bedroom, her mother told the victim to get into the closet; while in there, the victim heard Fondren yelling for her to come out and her mother yelling “no”; when she came out of the closet 10 or 15 minutes later, both her mother and Fondren were clothed; after her mother told her to wash herself off, her mother followed the victim into the bathroom; when she washed the victim in her “took-took area,” her mother commented that she saw blood and the victim also saw *1352 blood on the washcloth; and after the two dressed, Fondren unlocked the bedroom door and the two went into the living room where they watched television until the three left. She also testified that the victim stated that she did not see Fondren with a weapon after he stopped at his brother’s house.
After the above testimony by Investigator Standiver, the jury saw a videotape of another statement of the victim to the officer made on the day following the victim’s statement at the police station.
The prosecution then presented the testimony of a nurse to the effect that, during an examination of the victim on the day after the alleged offense, she observed lacerations in the victim’s anal-rectal area, but did not recall anything about the victim’s hymen and vaginal area. She further testified that the victim was very quiet and apprehensive and that her mother did most of the talking.
The state’s final witness was the victim. She testified to the following: When she and her mother returned to Fondren’s apartment after their stay at the motel, her mother went to the bedroom and talked to Fondren; when her mother summoned her to the bedroom, her mother was crying and saying to Fondren “don’t do it”; Fondren told her to take off her clothes, so she went to the bathroom with her mother and undressed; Fondren called them from the bathroom and when they came out, Fondren was not clothed; he told the victim to get on the bed and to spread her legs; when she refused, he asked if she wanted to see her mother die; she spread her legs and he made her mother put vaseline around her “private part”; he then touched his “private part” to her vagina six or seven times and she felt pain; during this time, her mother was crying and pushing Fondren, trying to make him stop; when he stopped, she went into the bathroom; when she returned to the bedroom, Fondren made her drink tequila and then get on the bed again; after he made her mother “hold his private part to make it hard,” he “tried it again”; after he stopped, she and her mother, both crying, returned to the bathroom; when they returned to the bedroom, Fondren told her mother to undress and upon her mother’s order, she shut herself in the bedroom closet where she neither saw nor heard anything; after 15 or 20 minutes, her mother said that she could come out; when she emerged from the closet, neither Fondren nor her mother was clothed; and Fondren let them leave the bedroom. The victim also testified that these events occurred over a period of three hours; that one time she was lying on her stomach and Fondren did not get on top of her; that when they were in the car after the events, she felt pain “on” her legs and that, when Fondren returned to the vehicle from his stop at his brother’s house, she saw a gun in his hand. She also testified that she remembered her conversation with her mother before they came out of the bathroom the first time wherein her mother told her to run away if she got a chance, that her mother did not want her to get hurt, and not to worry about her mother because either she would kill Fondren or he would kill her. The victim could not remember whether Fondren was clothed when she entered the bedroom or what, if anything, she saw blood on the washcloth when she washed up. She further testified that Fondren had told them that he was going to have them followed and that if they went to the police, he would know about it.
On cross-examination, the victim testified that she did not like living in Alabama, that she missed her friends in New Jersey from where she had moved shortly before the alleged offense, that she did not like Fondren because “he beat up on mommy,” that she “kinda hated” him, that she was “a little bit” jealous of the time that her mother and Fondren spent together, that she would not care if Fondren went to prison, and that she would like to see him away from her mother forever. The victim also testified that she was mistaken in her statement to the investigator and in her statement on the videotape that she did not see Fondren with a gun after he stopped at his brother’s house.
A letter that the victim had written to Fondren’s attorney, dated June 19,1992, was read into evidence. Beneath the victim’s signature was her mother’s signed name and the seal of a notary public. The letter began, “My mother said that I should write to you and tell you in my own words about Mi- *1353 ehael.” In the letter, the victim confessed that she had lied about Fondren’s having raped her and she recanted her story of the rape; she explained that she had made up the story because she did not like Alabama and she felt that her mother was paying too much attention to Fondren and not enough to her; and she proclaimed that Fondren did not hurt her or try to force her to do anything and that he is “a very good person and tries very hard.” She wrote, “I just want to be with my mother and I don’t want him ... to be in jail for anything he did not do.”
The victim testified that no one had forced her to write the letter, that her mother had not told her to write it, and that she wanted to write it. She admitted, however, that its contents were not true. She explained that she wrote the letter because she was feeling guilty because “everyone thought that mommy did something wrong and she really didn’t” and because she was trying to protect her mother. She further stated that, at the time she wrote the letter, she had been returned to her mother’s custody (from a foster home); that she did not show the letter to her mother; that it was her mother’s idea to have the letter notarized; that her mother addressed the envelope; and that her mother was with her when she had it notarized and when she mailed it. She also testified that although she did not know that the addressee of the letter was in fact Fondren’s attorney, she picked a name on a piece of paper from her mother’s purse and guessed him to be Fondren’s counsel. Finally, pursuant to the trial court’s questions to the victim in a bench conference, the victim recanted her testimony that she had signed her mother’s name to the letter. Although the court considered her to be a “willful liar,” she did not recant during the repeated questioning by the trial court until her mother admitted that she (the victim’s mother) had in fact written her signature. The court expressed its concern about the victim’s propensity to lie.
The prosecution then rested, and the trial court granted the mother’s motion for a judgment of acquittal. Fondren presented no evidence on his behalf. Fondren’s attorney did call the mother to testify about some letters she had written in which she asserted that Fondren was not guilty.[2] However, the court pointed out that the mother was still charged with the offense of kidnapping the victim to prevent the victim from testifying before the grand jury or at trial.[3] The court warned that it would not allow the mother to “pick and choose” on what questions she could assert the Fifth Amendment. After the court stated that the defense had a subpoena for the mother and that it would call the mother as a witness, defense counsel reiterated that jeopardy had already attached in regard to the mother. The court explained that the mother was not in jeopardy in regard to the rape charge because it had been dismissed, but that she was in jeopardy in regard to the kidnapping charge, and it considered that this was sufficient reason for the mother to assert her Fifth Amendment right against self-incrimination. The court further proclaimed that it would not order the mother to testify if she chose not to. Then Fondren’s attorney conferred with Fondren, and he announced-that they had decided to rest.[4]
*1354 In this case, it is beyond refute that the introduction of the mother’s statement through the detective’s testimony “added substantial, perhaps even critical, weight to the Government’s case in a form not subject to cross-examination.” 391 U.S. at 128, 88 S.Ct. at 1623.
“Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.”
Id. at 136, 88 S.Ct. at 1628 (footnote omitted). Compare Schneble v. Florida, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972) (“In some eases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant’s admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.”).
We are keenly aware of the fertile ground suggested by the record for potential impeachment of the mother and her statement to Detective Stewart, had she testified or, put another way, had Fondren not been denied his right of confrontation. The dialogues of counsel throughout the transcript refer to behavior by the mother that calls her credibility into question. For example, there was a discussion about accusations against Fondren, made several months before the instant accusation, of an assault on the mother and of an attempted rape of the victim that occurred in New York. This attempted rape was also alleged to have occurred in the mother’s presence. Evidently, Fondren pleaded guilty to second degree assault, and the mother requested that the prosecutor not pursue the alleged attempted rape charge. The affidavit of the Jefferson County prosecutor, which is in the record, states that, in regard to the attempted rape and the assault charges against Fondren in New York, the mother “orchestrated a plea bargain whereby all charges — except the assault on her— would be dismissed, and Fondren received probation”; and that thereafter Fondren, the mother, and the victim moved to Alabama.[5]
In addition, there was reference, in counsel’s opening statements, to the mother’s involvement in witchcraft. Reference was also made to an alleged telephone call by the mother to a deacon of a Baptist church, wherein the mother allegedly inquired if the deacon could help her to find an appropriate male to have sex with her daughter.
Other potentially critical impeachment of the mother is her notarized affidavit, which is attached to Fondren’s pretrial motion to dismiss on the ground that the mother and the victim had recanted their accusations. The letter, addressed to Fondren’s counsel, encloses two notarized statements — one from her and one from her daughter. It is this latter statement that was used to impeach the victim. The mother’s letter and the two enclosed statements were notarized by the same notary on the same date. In the mother’s letter and statement, the mother asserted that her statement to police was obtained under unfavorable conditions; that she had “exaggerated by stating that [she] witnessed such an episode, in order to make sure that Mr. Fondren was arrested and punished” and because she, having believed her daughter’s accusations, felt that he had violated her trust; that her daughter has since admitted to her that she had lied because she thought that they would simply leave Alabama and *1355 return to her friends, because she was jealous of the relationship she had with Fondren, and because Fondren and the mother argued; that the reason the victim has “come forth with the truth” is because she knows what is right or wrong; that Fondren did not rape the victim or her mother; and that by the time defense counsel had received this letter, the mother and the victim would have left the country.
The prosecutor’s pretrial affidavit also indicates that the mother was subpoenaed by the state to testify in the preliminary hearing, but that she refused to comply and failed to appear; that 10 days before the grand jury session, the mother summoned the victim to her car as the victim was walking from school to her foster home and drove her to Florida; and that while Fondren was in jail, he had only two visits, both from the mother (using two different aliases) during the week of the victim’s kidnapping.
There is no argument that the trial court’s instructions to the jury, as set out below, cured any error in the admission of the mother’s statement. These instructions were given during Detective Stewart’s testimony about the mother’s statement.[6]
“Ladies and gentlemen, any statement this witness makes as to what [the mother] told him about her action you may consider in deliberating. But, as in the case of the State v. Michael Fondren, do not consider it for the truth of the matter stated therein.
“You may take it as to what was on this lady’s mind. But anything she says about what Michael Fondren did or didn’t do, don’t consider that in the case of Michael Fondren.”
The Bruton Court, reviewing the admission of a eodefendant’s extrajudicial statements in light of similar, but more extensive jury instructions, refused to hold that such instructions were effective. The Bruton Court considered that the jury instructions were given in a context “in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.” 391 U.S. at 135, 88 S.Ct. at 1627. The Court concluded:
“Despite the concededly clear instructions to the jury to disregard [the codefendant’s] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner’s constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.”
Id. at 137, 88 S.Ct. at 1628.
Even the trial court in this case indicated that the mother’s statement could be used in determining Fondren’s guilt. In a charge conference, the trial court commented that “if [the jury] believe[s] that this defendant did those things that the mother claims he did, this little girl sitting here on this stand and said he did, and saying on that video that the mother put his penis in there and caused blood,” it could find forcible compulsion. Furthermore, when counsel reminded the court of its earlier warning to the jury that the mother’s statements could not be used against Fondren, the court stated the following: “[W]hat I was cautioning the jury was the admission of one accomplice is not the admission of the other. Because I didn’t find her to be an accomplice. But, certainly, her testimony in that he did these things, [the jury] may consider that now.”
This Bruton problem also calls into question trial counsel’s failure to object to the consolidation of the trials of the mother and Fondren. See Gladden v. State, 551 So.2d 1141 (Ala.Cr.App.1989) (wherein the court found to be reversible the consolidation of the prosecutions of two defendants where the following circumstances raised the possibility that a Bruton violation would necessitate a mistrial and a severance: the codefendant gave an extrajudicial statement implicating the other defendant and that statement was introduced into evidence, the trial court did not ask whether the eodefendant would testify, defense counsel did not indicate that the *1356 codeféndant might testify, and in fact the codefendant did not testify).
This cause is remanded for the trial court to consider the allegations of ineffective assistance of trial and initial appellate counsel. The trial court’s specific written findings of facts and conclusions of law should be included in the return to remand along with a transcript of any hearing, if one is held. The court shall take all necessary action to see that the clerk files the return no later than 42 days from the release of this opinion.
REMANDED WITH INSTRUCTIONS. 
BOWEN, P.J., and McMILLAN, J., concur. ,
TAYLOR, J., dissents with opinion.
MONTIEL, J., joins in the dissent.

. The record before us contains no transcript of any hearing on a motion for new trial.

. We assume that defense counsel is referring to a letter and affidavit that are attached to Fon-dren's pretrial motion to dismiss on the ground that the victim and her mother had recanted their allegation that Fondren had raped the victim. The letter is addressed to defense counsel and allegedly bears the mother's signature. An affidavit, which also allegedly bears the mother's signature, is attached. Their contents are discussed infra.

. The kidnapping charge apparently arose out of an alleged incident on April 24, 1992 (10 days before the grand jury was to convene to consider this case) in which the mother picked up the victim, who was living in a foster home, and drove her to Florida.

.There is an argument that it can not be assumed, from a silent record, that Fondren was denied his right to confront the mother. It could be argued that there is no showing that the mother was not present to testify and to submit to cross-examination. In Stinson v. State, 401 So.2d 257, 261-62 (Ala.Cr.App.), cert. denied, 401 So.2d 262 (Ala.1981), the declarant was present at the defendant's trial and was subject to cross-examination, had the appellant chosen to call him. The court found that it could not assume, from a silent record, that the declarant would have refused to testify if the defendant had called him as a witness. Under the circumstances before the Stinson court, it found that the defendant had not been denied his right to confronta *1354 tion; on the contrary, the defendant had simply chosen not to exercise that right.
We simply note that if this rationale is applied, the pertinent question becomes whether Fon-dren’s trial counsel was ineffective for failing to call the mother to testify so as to meet the threshold requirement recognized in Stinson.

. Our references to portions of the record calling the mother's credibility into question are not meant to suggest that the subject matter of these references would be appropriate for cross-examination. At this point, we see no need to anticipate specific questions that could have been asked or the context in which the subject matter of these references could have been properly disclosed had the mother testified.

. This instruction was in response to defense counsel's objection to the detective’s reiteration of the mother's account of "what Michael Fon-dren may have told [the mother]."